IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STACIA SMITH,<br>    Plaintiff,<br><br>   v.<br><br>RC OPERATOR, LLC, doing business as "WILLOW TERRACE,"<br>    Defendant. | CIVIL ACTION<br><br><br><br>NO. 15-3055 |

DuBois, J.                                                                     July 6, 2018

## M E M O R A N D U M

### I. INTRODUCTION

This case arises from the termination of plaintiff Stacia Smith's employment as a Unit Manager for defendant, RC Operator, LLC d/b/a Willow Terrace. Plaintiff alleges that her employment was terminated on the basis of her race, national origin, and religious beliefs, and in retaliation for requesting religious accommodations and for complaining of discrimination. In her First Amended Complaint, plaintiff asserts claims of discrimination and retaliation in violation of Title VII and § 1981. Presently before the Court is Defendant's Motion for Summary Judgment. For the reasons that follow, the Motion for Summary Judgment is granted.

### II. BACKGROUND

Plaintiff is a 52 year-old Jamaican woman who is a practicing Seventh-Day Adventist. Pl.'s SOF ¶¶ 1, 28. Defendant operates a long-term care facility which offers residential care and short-term rehabilitation services—Willow Terrace Nursing Center. Def.'s SOF ¶ 1. Defendant hired plaintiff in October 2012 as a Registered Nurse ("RN"). *Id.* ¶¶ 11, 12. On April 22, 2013, plaintiff was promoted to RN Unit Manager, where she worked until her termination in early January of 2014. *Id.* ¶¶15, 16.

Plaintiff's duties as a Unit Manager included, *inter alia*, supervising staff members to ensure that they were performing their job duties, preparing incident and audit reports, and educating the staff. Pl.'s SOF ¶ 17. Deborah Hawks, the Director of Nursing at Willow Terrace, supervised all of the Unit Managers, including plaintiff. *Id.* ¶ 18. Hawks in turn was supervised by Alex Ringkamp. *Id.* ¶ 22.

### A. Plaintiff's Requested Religious Accommodation

As a Unit Manager, plaintiff was required to work from 8:00 a.m. until 4:00 p.m. on Monday through Friday. Def.'s SOF ¶ 6; Pl.'s SOF ¶ 23. In practice, plaintiff asserts that she often worked until 6:00 p.m. or 7:00 p.m. in the evenings. Pl.'s SOF ¶ 23. At the end of each shift, Unit Managers were required to meet with Hawks in person for a "wrap-up meeting" to provide Hawks with information necessary for employees working the next shift. *Id.* ¶ 24. Unit Managers were not permitted to leave the facility until they completed their wrap-up meeting with Hawks. *Id.* ¶ 25.

Plaintiff is a practicing Seventh-Day Adventist. *Id.* ¶ 28. Plaintiff's religion prohibits her from working on the Sabbath, which begins at sunset on Friday and continues until sunset on Saturday. *Id.* ¶ 29. She said she spends her Sabbath attending religious services and listening to gospel music. James Dep. 44:4–46:10. Nearly every Friday, plaintiff participates in a prayer line which begins prior to sunset and continues until after sunset. *Id.*, Ex. C. Plaintiff also participates in a church-related prison ministry on some Friday evenings beginning at 7:30 p.m. on a monthly basis. *Id.* ¶ 33, James Dep. 52:1 –22. According to plaintiff, she informed Rozena Blocker, a nurse who interviewed plaintiff for her RN position, that she is a Seventh-Day Adventist. *Id.* ¶ 35. Plaintiff also testified that she "make[s] it known to everyone that [she is] a Seventh-Day Adventist." Smith Dep. 48:17–19. Additionally, plaintiff testified that she informed Ringkamp that she is a Seventh-Day Adventist in May or June of 2013 and asked to be

allowed to leave at 4:00 p.m. on Friday afternoons at the end of her shift, prior to sunset. *Id.* at 266:20 – 25; 267: 1–25.[1]

Prior to her promotion to Unit Manager, plaintiff was not required to work on the Sabbath, as she chose her own schedule. *Id.* ¶ 38. During the spring and summer of 2013, after plaintiff was promoted to Unit Manager, she was not required to work after the sunset, because the sunset was later in the evening after the end of her shift. *Id.* ¶ 39. However, the sun began to set earlier in the fall and into the winter months, at which time plaintiff became concerned that she would not be able to complete her shift prior to sunset. *Id.* ¶ 40. Plaintiff claims that she spoke with Hawks and "explained to her that [she is] not allowed to work [from] sunset Friday until sunset Sabbath, until after sunset Sabbath." *Id.* ¶ 42, Ex. A, Smith Dep. 80:6–8 ("Smith Dep.").[2] Despite plaintiff's request to leave on time at the end of her shift, she asserts that Hawks denied this request on multiple occasions. On one occasion, plaintiff wanted to leave prior to sunset on Friday to attend a prison ministry as part of her religious community service. *Id.* ¶ 44. She went to Hawks' office to complete her daily "wrap up" in the hopes of leaving prior to sunset; Hawks, however, remained on the telephone for a long period of time before addressing plaintiff and then required plaintiff to complete additional paperwork, which resulted in her staying past the sunset and missing her prison ministry. *Id.* With respect to the Sabbath, plaintiff asserts that she tried to arrive early to Hawks' office for her wrap-up meetings on Fridays, but that Hawks met with other Unit Managers and allowed them to leave before meeting with plaintiff, which prevented her from leaving before sunset. *Id.* ¶ 47. On other days, Hawks met with plaintiff quickly and permitted her to leave, but that on Fridays, Hawks kept her waiting and would not allow her to leave before sunset. *Id.* ¶ 48.

---

[1] Ringkamp testified that he was unaware that plaintiff was a Seventh-Day Adventist. Ringkamp Dep. 48:8–19.
[2] Hawks denies that plaintiff spoke to her about her religion or religious belief or requested such accommodation for religious reasons. Pl.'s SOF ¶ 42 n. 2, Ex. D, Hawks Dep. 31:10-13.

B.  Plaintiff's Allegations of Discrimination Based on Race and National Origin

Plaintiff also asserts that defendant discriminated against her on the basis of her race and national origin. Plaintiff speaks with a Jamaican accent. Pl.'s SOF ¶ 56. According to plaintiff, Hawks mimicked her Jamaican accent. *Id.* ¶ 58, Smith Dep. 119:12–25. Plaintiff noticed that Hawks treated American employees more favorably than herself and her Jamaican colleagues. *Id.* ¶¶ 61, 62. For example, Dana Arrington, an African-American employee, was treated more favorably by Hawks, and was permitted to leave earlier in the afternoons than plaintiff, take long breaks and leave the facility during her shift to go shopping. *Id.* ¶ 62. When plaintiff asked Hawks why Arrington was treated more favorably, plaintiff asserts that Hawks responded that "she's one of us." Smith Dep. 120: 6–12. Plaintiff believed she was being treated differently because she was Jamaican. Smith Dep. 148: 1–8. Plaintiff states she reported Hawks' alleged disparate treatment of Jamaican employees to Ringkamp, including that Hawks treated Arrington more favorably and stated that Arrington was "one of us." Smith Dep. 126: 12–25, 127: 1–18.

C.  Plaintiff's Termination

Defendant asserts that plaintiff was terminated for poor performance as a Unit Manager.[3] On September 10, 2013, and again on September 28, 2013, Hawks issued plaintiff an "Action Plan" for alleged deficiencies in her performance as Unit Manager. *See* Def.'s SOF, Ex. D-6. The Action Plan stated that plaintiff failed to, *inter alia*, prepare timely incident reports, perform skin checks on residents for wounds; take skin and nutrition minutes and weigh residents, to monitor nurses in her unit resulting in disheveled rooms and unattended safety hazards. Def.'s

---

[3] Prior to plaintiff's promotion to Unit Manager, she was disciplined in her capacity as an RN. On December 20, 2012, plaintiff was disciplined by the Director of Nursing at the time, Janet Rossi, and she received an Educational Consult for failing to complete visual examinations of residents' skin and ensuring that residents under her care received baths and showers. Def.'s SOF ¶¶10, 11.

SOF ¶ 23.  Hawks stated that she met with plaintiff to discuss the Action Plan, which plaintiff signed, and continued to monitor plaintiff's performance in the months after issuing the Action Plan, including meeting with plaintiff on October 28th, November 18th, December 10th, December 19th, and January 2nd.  *Id.*, Ex. E, 52: 7–24.  Defendant claims plaintiff failed to improve her performance and she was terminated on January 2, 2014.

### III.  LEGAL STANDARD

The Court will grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A factual dispute is material when it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether . . . there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249.  In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor."  *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

### IV.  DISCUSSION

#### A.  Plaintiff's claims for discrimination under Title VII and § 1981

The parties agree that plaintiff's Title VII and § 1981 should be analyzed using the three-step burden-shifting framework established in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792

(1973).⁴ *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999). Under this framework, plaintiff must first establish a prima facie case of discrimination. *Jones*, 198 F.3d at 411. If a plaintiff successfully establishes a prima facie case of discrimination, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for its decision. *McDonnell Douglas*, 411 U.S. at 802. If defendant succeeds in articulating a legitimate, non-discriminatory reason for its decision, plaintiff bears the burden of showing that the employer's legitimate, proffered reason was merely a pretext for intentional discrimination. *Id.* at 804.

   i. *Plaintiff's Prima Facie Case*

To establish a *prima facie* case of discrimination, plaintiff must show that "(1) [she] is a member of a protected class; (2) [she] was qualified for the position [she] sought to attain or retain; (3) [she] suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). For the purposes of the summary judgment motion, it is undisputed that plaintiff has satisfied the first three elements of her prima facie case: she is a member of a protected class, was qualified for her position, and suffered an adverse employment action. Defendant contends, however, that plaintiff has failed to establish the fourth element of her prima facie case—namely, that the circumstances of her discharge do not permit an inference of unlawful discrimination.

Assuming *arguendo* that plaintiff established the fourth element of a *prima facie* case, plaintiff's claim fails under the third step of the *McDonnel Douglas* burden-shifting framework,

---

⁴ "Employment discrimination claims under Title VII and § 1981 are analyzed pursuant to the burden-shifting framework articulated in *McDonnel Douglas Corp. v. Green*., 411 U.S. 792 (1973)." *Coleman v. Blockbuster, Inc.*, 352 Fed. App'x 676, at *3 (3d Cir. 2009); *see also Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 499 (3d Cir. 1999) ("[T]he elements of employment discrimination under Title VII are identical to the elements of a section 1981 claim.")).

because plaintiff has presented insufficient evidence to permit a reasonable jury to conclude that defendant's proffered reason for her termination was pretextual.

> ii. *Defendant's Legitimate, Non-Discriminatory Reason for Termination*

In the second step of the *McDonnell Douglas* framework, defendant bears the burden of producing a legitimate, non-discriminatory explanation for its decision to terminate plaintiff. *McDonnell Douglas*, 411 U.S. at 802. The Court concludes that defendant has articulated such a reason in this case. Specifically, defendant based its decision to terminate plaintiff on plaintiff's repeated failure to cure deficiencies in her job performance. According to both Hawks and Ringkamp, Hawks spoke with plaintiff almost daily regarding her performance and expressed concerns that she was not completing her assignments, not providing the required support the nursing staff she supervised, and failed to complete audits. Def.'s Ex. F, Ringkamp Dep. 41: 12 – 19. In September 2013, defendant placed plaintiff on an "Action Plan," which detailed plaintiff's performance issues. The Action Plan stated that plaintiff failed to, *inter alia*, prepare timely incident reports, perform skin checks on residents for wounds, take skin and nutrition minutes and weigh residents, to monitor nurses in her unit resulting in disheveled rooms and unattended safety hazards.[5] Def.'s SOF ¶ 23. According to documentation on the Action Plan, Hawks reviewed plaintiff's performance on several dates after it was initially issued, including October 28th, November 18th, December 10th, December 19th, and January 2nd. Plaintiff's performance did not improve. Based on this evidence, the Court concludes that defendant has proffered a legitimate, non-discriminatory reason for plaintiff's termination.

At this point, the burden shifts to plaintiff to prove that defendant's reasons for termination were pretextual. *McDonnell Douglass*, 411 U.S. at 804.

---

[5] Plaintiff's poor performance is also corroborated by testimony of Pamela Wells, who served as the Assistant Director of Nursing for a short period of time while plaintiff was employed at Willow Terrace. Def.'s Mot. Summary J., Ex. I, 42:20 - 24, 81:16 – 83: 24.

### iii. Plaintiff's Evidence of Pretext

To prove pretext, a plaintiff can either: (1) present evidence which "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action," or (2) present evidence which "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication." *Atkinson v. LaFayette Coll.*, 460 F.3d 477, 454 (3d Cir. 2006) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994)). For example, a plaintiff may "show that the employer has previously discriminated against [him], that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998). Plaintiff may also "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997).

Plaintiff's evidence that defendant's reasons for terminating here are pretextual may be separated into four categories: (1) discriminatory statements made to plaintiff by Hawks and Hawks' preferential treatment of American employees; (2) failure to permit plaintiff to leave at the end of her shift on Friday evenings; and (3) disagreement with defendant over her alleged performance deficiencies. The Court will address each of these categories of evidence in turn.

First, plaintiff alleges that Hawks mimicked her accent and on one occasion, told plaintiff that another employee was treated more favorably because she was "one of us," which plaintiff understood to refer to her national origin. Plaintiff also asserts generally, that Hawks treated American employees more favorably than Jamaican employees. To support this assertion,

plaintiff has submitted affidavits from Eulice James and Karen Collins who stated that Hawks treated American employees more favorably than foreign employees. James, testified that her perception of Hawks' treatment of others was based on a story that she had heard from an employee of African descent, rather than her own observations of Hawks' treatment of others. Dep. of Eulice James, 71:1–73:25. And when asked about whether she could cite a single example of someone at Willow Terrace being treated poorly because they were Jamaican, James responded, "I don't know any Jamaican nurses that used to work there." *Id.* 78:22–23. Collins testified generally that Jamaican employees "get in trouble" more than American employees and are "assigned too much work." Collins Dep. 64: 1-25. When asked to give a specific example of mistreatment by Hawks, Collins could not do so.[6] *Id.* The Court concludes that this evidence, based on rumors and generalizations, is insufficient to establish that defendant's legitimate reasons for plaintiff's termination were pretextual. *See e.g.*, *Harden v. Southwark Metal Mfg. Co.*, No. 99-CV-4666, 2002 WL 31194220, at *8 (E.D. pa. Oct. 2, 2002) ("rumors and generalizations are not sufficient to withstand Defendant's Motion [for Summary Judgment]").

Plaintiff also asserts that American employees were treated more favorably using proposed comparator evidence. When using comparators to establish pretext, plaintiff must show that the individuals engaged in the same conduct as her and that they shared in common all relevant aspects of her employment. *See Gazarov ex rel Gazarov v. Diocese of Erie*, 80 Fed.App'x 202, 306 (3d Cir. 2003) (noting that individuals are similarly situated only where they engaged in the "same conduct"). Plaintiff focuses on the conduct of Dana Arrington, a black woman who she asserts was treated more favorably by Hawks. Specifically, plaintiff asserts that Arrington was permitted to leave early and was insubordinate and rude to Hawks. Pl.'s SOF ¶ 94–96. Plaintiff asserts that Arrington was never disciplined for this behavior, but this evidence

---

[6] Plaintiff testified that Collins worked a different shift and "didn't see any interaction between Deb [Hawks] and myself . . . ." Smith Dep. 212:2–3.

is belied by the fact that both Hawks and Wells testified that Arrington was in fact disciplined for these actions and was subsequently terminated for poor performance. Hawks' Dep. 29:7–30:5, Wells Dep. 142:23–145: 5, Pl.'s SOF., Ex. V.[7] Plaintiff also points to the testimony of Hawks and Wells, who stated that other Unit Managers—who were not Jamaican or Seventh-Day Adventists—were subject to verbal warnings and action plans, but were not terminated. However, the record is devoid of any evidence showing that the alleged performance deficiencies of the remaining alleged comparators were as frequent or persistent as plaintiff's. *See Anderson v. Haverford Coll.*, 868 F.Supp. 741, 745 (E.D. Pa. 1994) (holding that plaintiff "must establish that the other employee's acts were of comparable seriousness to his own infraction.").

Plaintiff's assertion that Jamaican employees were treated unfavorably is further belied by the fact that she was replaced by a Jamaican woman. While plaintiff is not required to show that she was replaced by someone outside of the relevant class, "the fact that a plaintiff claiming discrimination was replaced by an individual from within the same protected class might have some evidentiary force." *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 354 (3d Cir. 1999). The Court concludes that these alleged stray remarks and unsupported allegations that Jamaican employees were treated less favorably than American employees are insufficient to demonstrate that defendant's reasons for terminating her were pretextual. *See e.g.*, *Thomas v. Wheeler*, 295 Fed. App'x 537, at *2 (3d Cir. Oct. 8, 2008) (affirming District Court's grant of summary judgment on ground that plaintiff made vague allegations of derogatory comments unsupported by sufficient detail); *Rose v. Woolworth Corp.*, 137 F.Supp.2d 604, 610 (E.D. Pa. 2001) (holding that racist comments were not sufficient to demonstrate pretext where plaintiff had "repeated performance failures.").

---

[7] Moreover, plaintiff fails to show that Arrington engaged in the same conduct that led to her termination, so she is not an appropriate comparator. *See Gazarov ex rel Gazarov*, 80 Fed. App'x 202, at 306.

With respect to plaintiff's claim of religious discrimination, she asserts that Hawks routinely kept her late on Friday evenings. Plaintiff, however, identified only one evening when she was denied a request to leave work prior to sunset to observe the Sabbath. On that occasion, in September 2013, plaintiff testified she was unable to attend her monthly prison ministry because Hawks did not permit her to leave on time. According to plaintiff, she was required to stay until approximately 6:30 p.m. that evening. Smith Dep. 91:1–24. Notably, in September of 2013, the earliest time that the sun set was at 6:46 p.m. Def.'s Mot. Summary J., Ex. G. Moreover, the record shows that the prison ministry began at 7:30 p.m. and it takes plaintiff approximately thirty to thirty-five minutes to drive to the prison. Smith Dep. 87:11. Accordingly, plaintiff's own timeline suggests both that she was permitted to leave prior to sunset, in accordance with her religious obligations, and would have had sufficient time to travel to her prison ministry.[8]

Further, plaintiff fails to present evidence, other than her own testimony, that her employer was aware of her need for religious accommodation. Although plaintiff testified that she notified a number of her colleagues of her religious beliefs, it is undisputed that plaintiff did not inform her supervisors[9] that she was a Seventh-Day Adventist upon her promotion to Unit Manager. Pl.'s SOF ¶ 50.[10] Moreover, although plaintiff testified she informed Ringkamp of her religious beliefs in May or June of 2013, at that time of the year, she did not have any issues leaving in time for the Sabbath because the sunset occurred well after her shift ended.[11] Based

---

[8] Plaintiff testified that she lives approximately five minutes from Willow Terrace. Smith Dep. 87:9.
[9] On this issue, it is important to note that plaintiff had different supervisors – Hawks and Ringcamp – as Unit Manager.
[10] Both Ringkamp and Hawks dispute that plaintiff ever told them that she was a Seventh-Day Adventist. Ringkamp Dep. 48:8–19; Hawks Dep. 56:6–57:2.
[11] Plaintiff also asserts that she complained to Ringkamp that Hawks did not permit her to leave prior to sunset. Plaintiff testified that she did so in the presence of a colleague, Rozena Blocker. Blocker submitted an affidavit stating that such conversation never took place. In addition, although plaintiff testified that she told Ringkamp that Hawks would not "wrap up" with her on time on Friday evenings and that Hawks was "mean to her," she did not

11

on this evidence, the Court concludes that plaintiff's reliance on one conversation with Ringkamp in which she stated that she was a practicing Seventh-Day Adventist which occurred eight months prior to her termination, and one specific example of a Friday when plaintiff was required to leave at 6:30 p.m.—prior to the sunset—so that she could attend prison ministry, is insufficient to establish that defendant's proffered reasons for termination were pretextual.[12]

Next, plaintiff asserts that Hawks fabricated her alleged performance deficiencies and failed to follow defendant's own procedures in terminating her. As an initial matter, plaintiff fails to point to any policies and procedures from which defendant supposedly deviated. Moreover, both Hawks and Ringkamp testified that Hawks spoke repeatedly to plaintiff about her alleged performance deficiencies prior to placing her on the Action Plan in September. The Action Plan documents follow-up evaluations with plaintiff on four occasions between the implementation of the September Action Plan and plaintiff's termination on January 2.[13]

With respect to plaintiff's contention that Hawks fabricated her alleged performance deficiencies, the record is devoid of any such evidence. Plaintiff was unable to state which portions of the incident report she believes were not truthful—she stated instead that: "I don't think everything [reported in the Action Plan] occurred, no." Smith Dep. 173:19–20. Moreover, plaintiff did not dispute every assertion in the Action Plan but instead testified that the deficiencies reported in the Action Plan were not her fault and were the fault of the nurses with whom she worked. Smith Dep. 134:1–142:23. Accordingly, although plaintiff asserts generally

---

state she specifically told Ringkamp she needed to leave promptly to observe the Sabbath. Smith Dep. 117:1 – 118:25.

[12] The evidence also shows that at the time of her employment at Willow Terrace, plaintiff was employed at Norristown State Hospital, where she often worked the 11:00 p.m. to 7:00 a.m. shift prior to her shift at Willow Terrace. Plaintiff also testified that on occasion, she worked on the Sabbath while employed at Norristown. Smith Dep. 25:2 – 26:18.

[13] Plaintiff asserts in her Response that Hawks did not follow-up with her after implementing the September Action Plan. However, plaintiff testified that she met with Hawks on December 19, 2013, and that Hawks required her to "come up with an intervention" to correct deficiencies in her performance. Def.'s Mot. Summary J., Ex. D, Smith Dep. 186: 2–187: 8. Moreover, Hawks documented that plaintiff refused to sign the Action Plan after meeting with her on November 18, 2013. Def.'s Mot. Summary J., Ex. D-6; Hawks Dep. 84:1–24.

that Hawks fabricated aspects of the Action Plan, she admits that at least some portions of the Action Plan were truthful, but simply not her fault, and fails to provide any evidence—other than her own testimony—that the Action Plan was fabricated. The fact that plaintiff disagrees with defendant's evaluation of her does not prove pretext. *Billet v. CIGNA Corp.*, 940 F.2d 812 (3d Cir. 1991); *see also Irving v. Chester Water Auth.*, 439 Fed. App'x 125, 127 (3d Cir. 2011) (Plaintiff's "self-serving deposition testimony is insufficient to raise a genuine issue of material fact")).

Notably, "[i]f the evidence tends to show that Defendant perceived Plaintiff's job performance as unsatisfactory, and that this perception . . . actually motivated Defendant's action, Plaintiff has not satisfied her burden of establishing pretext." *Jones v. University of Pennsylvania*, 2003 WL 21652083, at *6 (E.D. Pa. March 20, 2003). It is insufficient to show that the employer's decision was "wrong or mistaken;" rather, plaintiff must demonstrate that "the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Jones*, 198 F.3d at 413. In sum, plaintiff presents evidence of stray remarks, speculation unsupported by evidence in the record that defendant fabricated her performance deficiencies, and her own subjective beliefs about the reason for her termination. She has failed to meet her burden to show that discrimination was "more likely than not a motivating or determinative cause" of her termination and that defendant's legitimate, nondiscriminatory reasons were pretextual. *Fuentes*, 32 F.3d at 764.

B. <u>Retaliation Claims Under Title VII</u>

Plaintiff also alleges that she was retaliated against because of her complaints regarding alleged race-, national origin-, and religious-based discrimination.

An employee's retaliation claims are also subject to the *McDonnell Douglas* three-part burden-shifting framework. *Anderson v. Boeing Company*, 694 Fed. App'x 84, 88 (3d Cir. June

19, 2017). First, plaintiff must establish a *prima facie* case of retaliation under Title VII by showing that "(1) she engaged in an activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006)(quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)). If the employee establishes a *prima facie* case of retaliation, the burden shifts to defendant to establish legitimate, non-retaliatory reasons for plaintiff's termination. If defendant does so, plaintiff must prove by a preponderance of the evidence that defendant's proffered reasons were pretextual. *Id.* at 342.

For the same reasons stated above, the Court concludes that, *assuming arguendo* plaintiff meets her burden of establishing a *prima facie* case of retaliation, she cannot establish that defendant's legitimate, non-retaliatory reasons were pretextual. Thus, the Court grants Defendant's Motion for Summary Judgment with respect to plaintiff's retaliation claims.

V. **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted. An appropriate order follows.